| | |
|---|---|
| WARREN JOHNSON, ROBERT PANNELL, KIMBERLY SCOTT-MURRAY, ANNETTE SMITH, and SHERRY YOUNG, | No. 14 CV 8141 |
| Plaintiffs, | Judge Manish S. Shah |
| v. | |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a ADVOCATE CHRIST MEDICAL CENTER, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Five technicians in Advocate Christ Medical Center's Environmental Services Department complain of racial discrimination by their managers. They allege this treatment amounted to a hostile work environment in violation of Title VII and § 1981 of the Civil Rights Act. 42 U.S.C. § 2000(e), *et seq.*, and § 1981. Three plaintiffs, Warren Johnson, Kimberly Scott-Murray, and Annette Smith, also allege that they were wrongfully terminated on the basis of their race in violation of Title VII. 42 U.S.C. § 2000e-2(a)(1). Advocate moves for summary judgment, and its motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court

must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of proof on this point. *See Celotex*, 477 U.S. at 323.

The moving party must also file a statement of material facts for which there is no genuine issue and that entitle the movant to judgment as a matter of law. *See* N.D. Ill. Local Rule 56.1(a)(3). The nonmoving party must file a response to the movant's statement, which in the case of disagreement, must include: "specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* at 56.1(b)(3)(B). Statements of fact that are supported by the record, but that are not properly controverted, are admitted. *Id.* at (b)(3)(c); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Uncorroborated, self-serving testimony disputes a material fact only if it is based on personal knowledge or firsthand experience. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Arguments and conjectures do not properly controvert a statement of fact. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).[1]

---

[1] A plaintiff may not point to allegations in a complaint to defeat summary judgment. *Mosley v. City of Chicago*, 614 F.3d 391, 400 (7th Cir. 2010). While a verified complaint can be treated as an affidavit and proper testimony, *see Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996), its contents must comply with the basic evidentiary requirements of personal knowledge and admissibility to serve such a purpose.

## II.    Facts[2]

In 2012, Advocate hired Aramark Management Services and reorganized the supervision and operation of the Environmental Services Department (the parties call the department EVS). [64] ¶ 6; [62-2]. Aramark's management team was required to be familiar with and to follow Advocate's policies and procedures. [64] ¶ 7. Aramark employed most of the plaintiffs' supervisors named in this lawsuit: Aramark General Manager, Denise Wiley, [64] ¶ 8; Aramark Assistant Director of EVS, Chris Skalnik, [64] ¶ 22; Aramark Assistant Director of EVS, Mike Michalkowski, [64] ¶ 26; Aramark EVS Manager, Kym Hudson, [64] ¶ 18; Aramark EVS Manager, Larry Addison, [64] ¶ 19; Aramark EVS Manager, Susan Castillo, [64] ¶ 10; and Aramark EVS Manager, Dwan Jones, [64] ¶ 36. Advocate employed: Advocate Director of Human Resources, Jeremey Sadlier, [64] ¶ 31; Advocate Vice President of EVS, Margaret DeYoung, [64] ¶ 26; Advocate EVS Manager, Anthony Griffin, [62-2] at 84:22–23 and [64] ¶ 71; Advocate interim EVS Manager, Aaron Smith, [62-1] at 64:1–20 and [64] ¶ 15; Advocate Human Resources Consultant, Abigail Oman, [64] ¶ 76; and Advocate Human Resources Consultant, Adrian Thurman-Coe, [64] ¶ 25.

_____

[2] Bracketed numbers refer to entries on the district court docket. The facts are based on plaintiffs' response to Advocate's LR 56.1 statement, [64], and Advocate's response to plaintiffs' LR 56.1 statement, [71]. Both documents contain the asserted fact and the response. Unless otherwise noted, the facts related here are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by the local rules. When disputed, the facts are described in plaintiff's favor. Plaintiffs' objection to the length of defendant's paragraphs in the LR 56.1 statement is overruled. Each paragraph is a short statement organized around a single premise, and complies with the rule.

Each of the five plaintiffs, along with the majority of EVS associates, is African American. [1] ¶¶ 5, 7, 9, 11, and 13; [64] ¶ 8. Many members of EVS leadership are also African American: Denise Wiley, [64] ¶ 8; Aaron Smith, [64] ¶ 15; Kym Hudson, [64] ¶ 18; Larry Addison, [64] ¶ 19; Anthony Griffin, [64] ¶ 71; and Dwan Jones, [64] ¶ 36. Several EVS leaders are white: Chris Skalnik, [64] ¶ 22; Mike Michalkowski, [64] ¶ 26; Jeremey Sadlier, [64] ¶ 31; and Susan Castillo, [64] ¶ 10. The plaintiffs complain of mistreatment by both African American and white supervisors.

## A.    Plaintiff Warren Johnson

Plaintiff Johnson was employed with Advocate for less than one year; he received multiple disciplinary actions for failure to meet department cleaning standards and was ultimately terminated. Advocate's Smith gave Johnson a Level 1 warning in February 2014, [64] ¶ 16; Aramark's Addison gave Johnson a Level 2 warning in April 2014, [64] ¶ 19; Aramark's Hudson gave Johnson a Level 3 Final Warning in May 2014, [64] ¶ 20; and Aramark's Hudson placed Johnson on a Performance Deficiency Notice in July 2014, [64] ¶ 21. When Johnson's rooms continued to fall below department standards in July 2014, even after disciplinary warnings and training, Aramark's Skalnik and Hudson notified Johnson of Advocate's decision to terminate his employment. [64] ¶ 22; [71] ¶ 35 (Noting generally that Advocate reviewed termination decisions of its employees). Johnson disputes the validity of each of these disciplinary actions and believes they were motivated by race. [64] ¶¶ 16–22.

Johnson says two white female employees had higher rates of pay than he had upon hire, but he does not offer any admissible evidence to support this fact (out-of-court statements by the employees, offered for the truth as to their rates of pay, are inadmissible hearsay). [64] ¶ 11. Johnson was denied paid time off, but he does not know the circumstances under which his managers approved or denied other employees' paid time off requests. [64] ¶ 23. Advocate's Smith interrupted Johnson's breaks once or twice; Aramark's Michalkowski interrupted his breaks "maybe once"; and Aramark's Castillo interrupted his breaks "often." [64] ¶ 24. Johnson does not know if these managers interrupted other employees' breaks. [64] ¶ 24.

Aramark's Castillo was involved in hiring Johnson, but she later told him that he "clean[ed] like a monkey." [64] ¶¶ 10, 25. (Castillo denies saying this.) [64] ¶ 25. Aramark's Michalkowski would "mock [Johnson] as if to say African Americans only speak slang" by saying "yo" and telling other African American associates (whose names Johnson could not recall) that Michalkowski knew they could do it. [64] ¶ 26. Neither Johnson nor the other associates who heard this reported it to Advocate HR. [64] ¶ 26.[3] Johnson also heard Advocate's DeYoung say to another employee that it was a hassle to get black employees to leave and that she preferred Polish employees because they cleaned better. [64] ¶ 26. Johnson reported the incident to the president of the hospital, who told Johnson he would investigate the matter. [46] at 347:23–349:10. Johnson believes Aramark's Wiley

---

[3] Johnson's statement that a white employee told him that the policy that EVS technicians were to clean twelve beds per day did not apply to her is inadmissible hearsay. [64] ¶ 27.

discriminated against him, by putting him in "an environment that was segregated if you will," with harder tasks, after he discussed his idea to improve patient satisfaction. [64] ¶ 28.

Johnson created a list of associates (mostly African American) who he believed had payroll issues and who were treated poorly by Hudson. [64] ¶ 31. He gave Advocate's HR department the list and they investigated his concerns (Johnson contests the thoroughness of the investigation); some of the payroll issues were resolved. [64] ¶ 31.

## B. Plaintiff Kimberly Scott-Murray

Plaintiff Scott-Murray was employed by Advocate for over eleven years. Only during her last year of employment did Scott-Murray begin to receive disciplinary notices, which ultimately led to her termination. Aramark's Addison gave Scott-Murray her first level of discipline in July 28, 2014, for a break that Addison believed was unauthorized but that Scott-Murray believes was authorized. [64] ¶ 48. After Scott-Murray refused to sign the disciplinary notice and began to walk away, Aramark's Skalnik followed Scott-Murray and put his hands on Scott-Murray to turn her around. [64] ¶ 48. Scott-Murray reported the incident to HR; Advocate's Thurman-Coe investigated the incident and brought Scott-Murray back to work under a Performance Deficiency Notice by Aramark's Addison. [64] ¶ 49. In August 2014, Addison gave Scott-Murray a Level 3 Final Warning for absences, which Scott-Murray believes were excused paid time off. [64] ¶ 50. In August 2015, Addison, with Skalnik present, gave Scott-Murray a follow-up document to the

Performance Deficiency Notice that described poor attitude and behavior by Scott-Murray, with which Scott-Murray disagreed. [64] ¶ 51. Finally, in September 2014, Addison gave Scott-Murray a termination notice for unauthorized breaks, which Scott-Murray disputed and believed was race-based. [64] ¶ 52. Advocate approved the decision to terminate Scott-Murray. [46-2] at 211:14–23.

During her employment at Advocate, Aramark's Addison denied Scott-Murray paid time off six times, but she does not know the circumstances under which Addison granted other employees' requests. [64] ¶ 44. Scott-Murray says that white employees took unauthorized breaks, but she does not know if they were disciplined or spoken to by the managers about such breaks. [64] ¶ 53. She also cannot identify any employees who violated the attendance policy and who were not disciplined. [64] ¶ 53.

Aramark's Skalnik told Scott-Murray not to give him "the black girl ghetto attitude." [64] ¶ 45. Scott-Murray reported this to Advocate's DeYoung and Oman, and Skalnik never made such comments to her again. [64] ¶ 45. After she made the report, Skalnik and Addison began monitoring Scott-Murray and they moved her to more "strenuous" floors, but they did not discipline her. [64] ¶ 46.

## C.     Plaintiff Annette Smith

Plaintiff Smith was employed by Advocate for over four years. She began to receive disciplinary actions in the last year and a half of her employment, which ultimately led to her termination. Advocate's Griffin gave Smith a Corrective Action Notice in December 2012 for inappropriate behavior in front of a dispatcher; Smith

contested the action but it was upheld by an arbitration panel of associates. [64] ¶ 71. Next, Smith received a 30-day Performance Deficiency Notice in December 2013. [64] ¶ 73. While under a Performance Deficiency Notice, Smith refused to accept a change to her work assignment, which led Advocate to terminate Smith. [64] ¶ 76; [71] ¶ 12.

Smith says that two white employees had higher salaries than she had, but she does not offer any admissible evidence to support this fact (out-of-court statements by other employees about their own salaries, offered to establish their salary amounts, are inadmissible hearsay). [64] ¶ 68. She applied for several positions that she did not get, even though she believes she had the same or better qualifications than the white people who did get the positions. [64] ¶ 70. Smith did not know who received several of the positions she applied for; and for several other positions, Smith did not know the qualifications of the person who received the position. [46-3] at 33:15–44:5. To the extent Smith had personal knowledge of her competitors' qualifications, Smith based her judgments on what those employees told her—she never reviewed their resumes or job applications. [46-3] at 31:16–32:1. Smith also admits she did not know why white individuals were chosen for certain positions to which she applied. [46-3] at 33:9–10,

Skalnik, Hudson, and Michalkowski (all supervisors employed by Aramark) treated Smith unprofessionally and when she complained to Advocate HR about an incident she had with Hudson that led to a suspension, the suspension was overturned. [64] ¶ 72. She believes she received the December 2013 Performance

Deficiency Notice as retaliation for her complaint to HR. [64] ¶ 75. HR investigated her allegations regarding the allegedly retaliatory Performance Deficiency Notice. [64] ¶ 75.

When Aramark's Castillo attempted to reassign Smith to the adult side of the emergency room from the pediatric side of the ER, Smith asked if someone else could work that side (as another Polish associate had allegedly done without being disciplined by Castillo). [64] ¶¶ 77–78. Castillo told her to accept the change or to go home and Aramark's Hudson intervened to tell Smith to go home. [64] ¶¶ 77–78. Smith complained to HR about this incident and HR investigated the issue. [64] ¶ 79.

### D.    Plaintiff Robert Pannell

Plaintiff Pannell has been employed with Advocate for over a decade. He never received disciplinary actions. He voluntarily reduced his hours to part-time, and declined a promotion to a "Tech 2" position because it was not on his preferred shift. [64] ¶¶ 33, 36. Pannell applied to several positions that he did not receive; but he does not know who was hired into those roles. [64] ¶ 35. He says two white associates with less seniority and experience were promoted to the Tech 2 role, but he does not cite any admissible evidence to support this statement—and his belief is belied by the fact that one person ("Fred") is unidentified and the other (John Mueller) had 20 years of experience. [64] ¶ 37. Notably, Pannell admits that some African Americans were employed as Tech 2s. [64] ¶ 37. Pannell believes he did not receive Tech 2 training because he was being retaliated against for witnessing

Aramark's Skalnik allegedly placing his hands on Scott-Murray and for filing this lawsuit. [64] ¶ 41.[4] Pannell says Aramark's Addison, Jones, and Skalnik micromanaged him, but he does not know if they treated white employees differently. [64] ¶ 39. Pannell was aware that a couple of white associates worked on the upper floors (the more strenuous floors) and a few black associates worked on the lower floors, and he did not know the individual technicians' floor and schedule preferences. [64] ¶ 34.

Pannell once heard Aramark's Hudson, who was not Pannell's supervisor, call Young "a black B. Bipolar. Crazy." [64] ¶ 42. Pannell also heard Aramark's Michalkowski "try to rap" and say "like I am from the hood too" in front of one African American associate two or three times, but he does not know if the associate found it offensive. [64] ¶ 42.

### E.    Plaintiff Sherry Young

Plaintiff Young has been employed with Advocate for over a decade. Like Pannell, she never received disciplinary actions. Young says it was discriminatory that a white employee was permitted to stay on the second- and third-floor shift after the reorganization because the white employee's managers requested that she stay on those floors, whereas Young was not permitted to stay on the fifth floor after the reorganization even though her managers also requested that she stay on that floor. [64] ¶ 56. Another black associate was given the fifth-floor assignment after the reorganization. [64] ¶ 56. Young believes Aramark's Addison and Hudson

---

[4] Pannell does not argue that his present lawsuit includes a claim for retaliation.

favored white people, but offers no support for this conclusion. [64] ¶¶ 57, 60. Addison denied four or five of Young's paid time off requests, but Young does not know how Addison granted or denied other employees' requests. [64] ¶ 58. Aramark's Hudson called Young (and no one else) "black wig-wearing witches," and other names related to being "bipolar" or "crazy." [64] ¶ 59. Young heard Aramark's Michalkowski mock African American associates three times by talking the way the associates talked to one another saying "yo n__ this" (which Michalkowski denies), but she does not know if it offended the associates. [64] ¶ 65.

## F.     Advocate's Investigation

Aramark's General Manager and several of Advocate's HR consultants looked into concerns about African American associates being treated differently than non-African American ones, and created an action plan to retrain Advocate and Aramark leadership. [64] ¶ 8. In response, Advocate provided mandatory discrimination and harassment training for all Advocate and Aramark mangers (whether Advocate ensured that all such managers attended the trainings is contested). [64] ¶ 8. Advocate also instructed its HR consultants and leadership to round with associates in EVS. [64] ¶ 8. No EVS associates have since come forward with new allegations of discrimination. [64] ¶ 8.

## III.   Analysis

### A.     Hostile Environment

The standards and methods of proof for racial discrimination claims under Title VII and § 1981 are the same. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012)

(*overruled on other grounds*) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403−4 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). Summary judgment on a hostile work environment claim, under either statute, is proper unless there is an issue of material fact with respect to each of the following four elements: (1) the harassment was unwelcome; (2) the harassment was race-based; (3) the conduct was severe or pervasive; and (4) there was a basis for employer liability. *Cole v. Bd. of Trustees of N. Illinois Univ.*, No. 15-2305, 2016 WL 5394654, at *5 & n.6 (7th Cir. Sept. 27, 2016).

1. *Plaintiffs Did Not Experience Severe or Pervasive Race-Based Harassment*

To prevail, each plaintiff must show the complained-of conduct had "a racial character or purpose" and the conduct was "subjectively and objectively so severe or pervasive that it altered the conditions of his employment." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *see also Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (finding behavior "unfortunate" but not indicative of "harassment"). Whether the alleged discrimination was subjectively severe or pervasive is not at issue; each plaintiff had the subjective belief that he or she experienced severe or pervasive discriminatory conduct.

"There is no bright-line test for determining when a workplace becomes objectively hostile." *Valentine v. City of Chicago,* 452 F.3d 670, 681 (7th Cir. 2006). A work environment is objectively hostile when a reasonable person would find it hostile or abusive. *Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004). Useful factors to consider are: "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ford v. Minteq Shapes & Services, Inc.*, 587 F.3d 845, 847 (7th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The parties reference the direct and indirect methods of proof (when discussing both the hostile environment claims and the termination claims) and invoke the now-jettisoned language of "convincing mosaic." *See Ortiz v. Werner Enterprises, Inc.*, — F.3d. —, 2016 WL 4411434, *3–4 (7th Cir. Aug. 19, 2016).[5] And in responding to the summary judgment motion, plaintiffs treat their claims collectively. Instead of providing a distinct analysis as to each plaintiff's claim of discrimination, plaintiffs focus on painting a picture of Advocate's general discriminatory character. This approach is not necessarily wrong, since evidence of Advocate's intent as to one plaintiff can be admissible in consideration of another plaintiff's claim. Given how the parties have briefed the motion, the most sensible approach to resolving it is to focus on the bottom line and determine whether there is evidence from which a reasonable trier of fact could infer discrimination from Advocate's actions as to each particular plaintiff. *See Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016).

Plaintiffs characterize their claims as "Title VII and Section 1981 hostile environment claims," [62] at 4, but also argue that tangible, adverse employment actions were taken against them on the basis of race. [62] at 6–8, 11–12. Ordinarily, adverse employment actions are an element of disparate treatment claims. Discrete

---

[5] The parties briefed this case before the court of appeals decided *Ortiz*.

acts such as failures to promote or denials of transfers are separate actionable practices, and hostile environment claims are different in kind from discrete acts. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002). In any event, whether part of a hostile work environment or a discrete act of discrimination, not all workplace grievances are actionable under Title VII and § 1981. *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006). Plaintiffs use the term "adverse employment actions," but many of the actions they complain about fall outside the recognized categories. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (articulating three categories of actionable adverse employment actions) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir.2004)).

Plaintiffs' inability to take uninterrupted breaks did not affect their compensation or fringe benefits, nor is there any evidence that taking breaks influenced their career prospects. Similarly, the denials of a limited number of paid time off requests did not amount to withholding a fringe benefit. *See e.g. Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (declining to find adverse employment action where annual leave requests were denied because work was backlogged) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (no adverse employment action where preferred vacation schedule was denied)). Plaintiffs complain of micromanagement, but employers may engage in oversight without running afoul of Title VII and § 1981. That a manager scrutinizes an employee's work, or watches an employee while performing job duties does not necessarily

create a hostile work environment. *Glebocki v. City of Chicago*, 32 Fed. App'x. 149, 154 (7th Cir. 2002). Finally, "harder work assignments do not constitute an adverse employment action." *Fane v. Locke Reynolds*, LLP, 480 F.3d 534, 539 (7th Cir. 2007). So long as the undesirable work assignment is a type of assignment or duty that would normally be a part of one's job description, it does not support a hostile work environment claim. *Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009). Plaintiffs have not shown that assignments to higher, or undesirable, floors were beyond the scope of their job descriptions, so these complaints cannot be adverse employment actions. No qualitative or quantitative change in employment conditions has been shown from any of these actions. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

Denial of promotions, positions, or of just compensation would be adverse employment actions. *Nichols*, 510 F.3d at 780. Plaintiffs, however, cannot show that these actions were race-based, and so they do not advance the claims. *See Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015) (party opposing summary judgment must identify "admissible evidence that would permit the trier of fact to make a finding in the non-movant's favor as to any issue as to which it bears the burden of proof"); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("Personal knowledge can include reasonable inferences, but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors."). Both Johnson and Smith allege that white employees had higher rates of pay upon hire, but failed to offer admissible evidence on that point. Pannell offers

no admissible evidence to support his assertion that two white associates with less seniority and experience were promoted to the Tech 2 role. Pannell and Smith applied to several positions that they did not receive, but they do not know who was hired into these roles.

The other actions—concerning breaks, paid time off, and assignments—were not only *not* adverse, but also *not* race-based. Advocate's Smith interrupted Johnson's break once, [64] ¶ 24, and Aramark's Michalkowski interrupted Johnson's breaks often, [64] ¶ 24. Scott-Murray claims she was disciplined for unauthorized breaks. [64] ¶ 52. But neither Johnson nor Scott-Murray knew whether the managers interrupted other employees' breaks, [64] ¶ 25, or disciplined other employees for unauthorized breaks, [64] ¶ 53. Consequently, Johnson and Scott-Murray cannot show that those managers singled them out, much less that they singled them out because of their race. Johnson, Scott-Murray, and Young do not know the circumstances under which their managers approved or denied other employees' paid time off requests—and they offer no other evidence from other sources to support an inference of discriminatory motive. [64] ¶¶ 23, 44, 58. As a result, there can be no inference that the denials were based on race, as opposed to some other legitimate grounds such as needing to have those shifts covered and an insufficient number of available EVS associates. Neither Scott-Murray nor Pannell alleged that their managers only monitored or micromanaged African American EVS associates. They did not know if their supervisors ever monitored or micromanaged non-African American EVS associates. Therefore, they have no basis

to claim the monitoring and micromanaging was race-based. And while there is one instance of Aramark's Castillo singling plaintiff Smith out for objecting to a floor assignment, [64] ¶¶ 77–78, there is no evidence supporting a broad-brush theory of racial assignments. Some white employees worked on the higher floors, and some African American employees worked on the lower floors, and employees may have had individual preferences. In sum, then, these non-adverse actions—with no evidence to support a racial motive behind them—were not objectively offensive, race-based, or severe or pervasive, and do not contribute to an actionable claim for a hostile environment.

Subjective beliefs of plaintiffs about disparate treatment, without more, do not support a hostile work environment claim. If the converse were true, the subjective beliefs of plaintiffs, on their own, would create genuine issues of material fact and in turn, would defeat virtually all defense motions for summary judgment. *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996). Instead, plaintiffs must support their subjective beliefs with allegations of how that treatment affected their work performance in a quantifiable or quantitative way. *Johnson*, 325 F.3d at 901; *see also Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming a grant of summary judgment for defendant in part because plaintiff offered no proof that she could not do her job because of how her supervisors and co-workers treated her). Incidents that "caused [plaintiff] so much stress and embarrassment that she would break down and cry at work," for

example, contribute to a hostile environment. *Berry v. Delta 1031 Airlines*, 260 F.3d 803, 807 (7th Cir. 2001).

Johnson says Aramark's Wiley discriminated against him by putting him in a "segregated" environment with harder work, [64] ¶ 28, but his perception is purely subjective in light of the evidence that white employees worked on higher floors and that the level of difficulty can be a function of individual preference.[6] Smith says Aramark's Skalnik, Hudson, and Michalkowski treated her "unprofessionally," [64] ¶ 72, but she does not relate this back to a racial motivation. And Young says Aramark's Addison "favored certain White associates," [64] ¶ 57, and Aramark's Hudson "loved the white people," [64] ¶ 60. Unlike the plaintiff in *Berry*, plaintiffs Johnson, Smith, and Young do not claim that this treatment upset, frustrated, embarrassed, or even stressed them in a significant way. These complaints are too subjective and insignificant to constitute adverse employment actions.

Offensive comments can create a hostile environment. But, isolated comments, even if offensive, must be extremely serious to be actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). One overtly racial comment is too many in terms of basic civility and expected workplace norms, but several offensive comments can be made over a period of time without necessarily being as severe or pervasive as to create a hostile environment. *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754

---

[6] Johnson also alleges that a white employee told him the policy that EVS technicians were to clean twelve beds per day did not apply to her. [64] ¶ 27. This statement is inadmissible hearsay.

(7th Cir. 2002). Additionally, "[w]hen harassing statements are directed at someone other than the plaintiff, the impact of [such] second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.,* 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation omitted). In the end, a hostile environment is "a workplace [that] is permeated with discriminatory intimidation, ridicule, and insult." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citation omitted).

Aramark's Castillo once told Johnson that he "clean[ed] like a monkey," [64] ¶ 25, and Aramark's Michalkowski would "mock [Johnson] as if to say African Americans only speak slang," [64] ¶ 26. Advocate's DeYoung made a comment (not directed to Johnson) that it was a hassle to get blacks to leave and she preferred Polish associates because they cleaned better. [64] ¶ 26. Aramark's Skalnik told Scott-Murray not to give him the "black girl ghetto attitude," [64] ¶ 45. Pannell once heard Aramark's Hudson call Young "a black B. Bipolar. Crazy." [64] ¶ 42, and he heard Aramark's Michalkowski "try to rap" and say "like I am from the hood too" in front of one African American associate two to three times, [64] ¶ 42. Aramark's Hudson called Young "black wig-wearing witches," [64] ¶ 59. Each of these comments should be cause for concern, but they were not so serious (on their own or in combination) or so numerous that they materially influenced plaintiffs' working conditions. There is no evidence that the comment Aramark's Castillo's made to Johnson, for example, had any bearing on Scott-Murray's work environment; so combining the plaintiffs' experiences does not advance any one plaintiff's claim. The

things each plaintiff heard were too isolated, indirect, and sporadic to be actionable. Although plaintiffs should not encounter racism in their workplace, a hostile work environment claim under Title VII and § 1981 does not provide relief from the comments made to plaintiffs.

Of course, courts must consider the totality of the circumstances and look for a pattern of ongoing harassment. *Yancick*, 653 F.3d at 544. "A harasser's actions or remarks that do not seem based on unlawful animus may be 'sufficiently intertwined' with discriminatory remarks to conclude that discriminatory animus motivated all of them." *Cole*, 2016 WL 5394654 at *5 (citation omitted). While each plaintiff harbored a subjective belief that certain Aramark supervisors were hostile to African Americans, the objective evidence—with no support for a finding that any particular decision was race-based—establishes a series of events immaterial to plaintiffs' workplace conditions and accompanied by only sporadic, offensive comments. Plaintiffs have not raised a genuine issue of material fact, and defendant has established that plaintiffs did not experience a hostile work environment under Title VII or § 1981.

### 2. *There Is No Basis for Employer Liability*

Employers are strictly liable for harassment by their supervisors, unless the employer can show the harassment did not result in a tangible employment action. *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004). Not every employee in a supervisory role is a "supervisor" such that his or her actions confer strict liability upon the employer, though. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d

526, 536 n.19 (7th Cir. 1993) (declining to hold the employer strictly liable where the "supervisor" was too low in the employer's hierarchy to act as the employer's agent). A "supervisor" has authority to take tangible employment actions—to hire, fire, demote, promote, transfer, or discipline—against the employee. *Vance v. Ball State University*, 570 U.S. —, —, 133 S.Ct. 2434, 2454 (2013).

Advocate and Aramark are separate entities with different employees. Their employees interact in the EVS by virtue of the Services Agreement. [62-1] at 44:24–45:8; [62-6]. Advocate could only be strictly liable for actions by its own employees: Director of Human Resources, Jeremey Sadlier; Vice President of EVS, Margaret DeYoung; EVS Manager, Anthony Griffin; interim EVS Manager, Aaron Smith; Human Resources Consultant, Abigail Oman; and Human Resources Consultant, Adrian Thurman-Coe. Of these Advocate employees, the plaintiffs only identify DeYoung, Griffin, and Smith as related, in any way, to the alleged harassment. DeYoung made a comment that showed racial animus, but it was not directed at any of the plaintiffs nor was it made in reference to any of the plaintiffs' employment. [64] ¶ 26. Griffin gave plaintiff Smith a Corrective Action Notice, but an arbitration panel upheld his decision as proper, and there is no evidence that this panel (made up of black and white associates) had any reason to conclude the notice was discriminatory. [64] ¶ 71. Advocate's Smith gave plaintiff Johnson a Level 1 warning and interrupted his break once, but there are no facts to support that either of these actions were motivated by race. [64] ¶¶ 16 and 24.

To the extent Advocate could be held liable for actions by Aramark employees, the proper standard is negligence.[7] Courts analyze employer liability against a negligence standard regardless of whether the alleged harasser is an employee, independent contractor, or customer. *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 605 (7th Cir. 2006).[8]

Under these circumstances, an employer like Advocate is liable for the acts of the harassers employed by Aramark only if Advocate was negligent in discovering or remedying the harassment. *Williams*, 361 F.3d at 1029; *see also Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000). Discovery and remediation of harassment need not be perfect; an employer must simply take reasonable steps to learn of and to rectify harassment by its employees. *Berry*, 260 F.3d at 811. What is "reasonable" depends on the gravity of the harassment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995). But, "[a] prompt

---

[7] The Aramark supervisors were not agents of Advocate. Courts consider many factors in deciding whether an actor is an agent or an independent contractor. *See Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 565–66 (7th Cir. 2009) (concluding the actor was an independent contractor in part because he controlled the details of his own work and was only responsible to the other for the results of his work). Under the Services Agreement, Aramark was responsible for managing and supervising EVS associates. [71] ¶ 36. Advocate did not have authority to hire, fire, or discipline Aramark supervisors directly. [70-3] at 100:12–101:16. Aramark had complete control over the details of how EVS was run and Aramark was only responsible to Advocate for the end result—a well-functioning department. Advocate could not influence the way Aramark conducted business, unless Aramark acquiesced or if Advocate breached the Services Agreement. These are not the characteristics of an agency relationship, and I conclude that Aramark was Advocate's independent contractor. This does not mean that Advocate cannot be liable; its liability can be based on the acts of an independent contractor if Advocate intentionally tolerated unequal working conditions. *See Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

[8] Relevant Aramark employees are: Denise Wiley, Chris Skalnik, Mike Michalkowski, Kym Hudson, Larry Addison, Susan Castillo, and Dwan Jones.

investigation is the first step toward a reasonable corrective action." *Cole*, 2016 WL 5394654 at *7. Employers also must be more vigilant when the potential harm to the employee is greater. *Erickson*, 469 F.3d at 606. Responses such as reprimanding the harasser, requiring the harasser to attend training, rearranging the harasser's schedule to minimally (or not at all) overlap with the complainant's schedule, circulating a memorandum about harassment and prohibiting the harasser from contacting the complainant, and investigating the complaint within two weeks of receipt of relevant information and taking action within five weeks by transferring harasser to a different department can be reasonable. *Milligan v. Bd. of Trustees of S. Illinois Univ.*, 686 F.3d 378, 384 (7th Cir. 2012) (collecting cases).

Here, plaintiffs contend Advocate's investigations of their complaints were not meaningful or thorough because the HR consultant did not speak to every African American EVS associate to ask if he or she had similar complaints and the HR consultant relied on prior conversations she had with some of the individuals to determine that none of them corroborated the claims. [62] at 16–17. Advocate's investigation may have been imperfect, but so long as Advocate's course of action was reasonable under the circumstances, Advocate cannot be deemed negligent. *Williams*, 361 F.3d 1030.

Advocate took reasonable steps to discover and address the harassment. When Johnson complained to HR about payroll errors and provided a list of associates who may have similar issues, Advocate investigated the complaint and actually resolved some of the issues. [64] ¶ 31. When Scott-Murray reported an

incident involving Aramark's Skalnik, HR investigated the complaint by talking to several employees who witnessed the event. [64] ¶ 49. When Smith contested her Performance Deficiency Notice as being a retaliatory measure, HR held follow up meetings to consider her complaints. [64] ¶ 75. And when Smith complained about disparate treatment, HR had multiple conversations with Smith and discussed the issues with Smith's supervisors. Plaintiffs do not complain that these investigations were not prompt; just that they were not conducted in the manner in which plaintiffs believe would be effective. But, the record shows that Advocate considered each complaint and inquired about the various issues. Given the undisputed circumstances—contradictory versions of stories, no serious threats or physical assaults, etc.—Advocate's investigations were reasonable.

Furthermore, Advocate took reasonable steps to remedy the alleged harassment once it learned of its existence. Advocate provided discrimination and harassment training to Advocate and Aramark managers and it instructed the leadership to round with associates in EVS. [64] ¶ 8. Plaintiffs note that not all managers attended such trainings, which is unfortunate, but does not raise a material dispute as to Advocate's negligence. An employer's response plan is not required to completely eradicate the harassment. *May v. Chrysler Group, LLC,* 716 F.3d 963, 971 (7th Cir. 2013). Since Advocate's training and rounding exercises, there has not been an additional complaint from an EVS associate. [64] ¶ 8. Advocate's response plan, therefore, was reasonably likely to prevent racial

harassment from recurring. *See Cerros v. Steel Tech., Inc.,* 398 F.3d 944, 954 (7th Cir. 2005).

No Advocate supervisor engaged in harassment, and to the extent any other Advocate or Aramark employees engaged in harassment, it was not due to any negligence by Advocate; thus, Advocate is entitled to judgment as a matter of law on plaintiffs' hostile environment claims.

### B.    Wrongful Termination

Only Johnson, Scott-Murray, and Smith allege that Advocate wrongfully terminated them on the basis of their race. [1] ¶ 36. Their wrongful termination claims all fail for similar reasons. Although each plaintiff originally met expectations in their performance reviews, [62] at 1, they each later received escalating disciplinary actions that caused Advocate to terminate their employment. [64] ¶¶ 18–21, 48–50, 71, 73, 77. In evaluating whether an employee met the employer's expectations, the employee's performance at the time of termination is what matters, not the employee's previous performance evaluations. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014).

The record establishes that Advocate had a non-racial basis for terminating Johnson, Scott-Murray, and Smith, given their disciplinary histories. With respect to Johnson, Advocate intervened early and often to provide Johnson warnings that his rooms were improperly cleaned and trainings on how to meet departmental cleaning standards. [64] ¶¶ 16, 19–22. Despite these efforts, Johnson's performance continued to fail quality checks over a six month period, causing Advocate to

terminate him. [64] ¶¶ 16, 19–22. As for Scott-Murray and Smith, a series of attendance and behavioral issues led Advocate to terminate both associates. [64] ¶¶ 48–52; [64] ¶¶ 71, 73, 76. Failure to meet an employer's quality standards, as well as attendance and behavioral issues, are all legitimate non-racial justifications for termination.

There is no evidence in the record that Advocate elected to *not* terminate a similarly situated, non-African American, employee who had comparable disciplinary records as Johnson, Scott-Murray, or Smith. Although plaintiffs have generally claimed that white employees received favorable treatment from Advocate and Aramark managers, all of those allegations fail to meet the requirement of identifying a non-African American employee with a similar record of misconduct, performance, qualifications, or disciplining supervisors. *See Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012). Further, while plaintiffs claim they received greater scrutiny of their work performance and break time, plaintiffs admitted they did not know if or how their managers reviewed similarly situated, but non-African American, associates' work performance and break times. Since plaintiffs have not proved that all things being equal, Advocate only terminated them, as African American employees, but not other employees outside that class, a reasonable jury could not infer discrimination from Advocate's termination practices. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013).

Plaintiffs' position is that the initial and ongoing discipline they received was race-based and therefore, the termination based on that discipline was tainted. To

succeed on this assertion, plaintiffs would need evidence of a link between the supposed bigotry and Advocate's termination decision. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Mere subjective belief that a link exists does not suffice. At most, plaintiffs have shown that certain Aramark (not Advocate) managers may have harbored racial animus. But, plaintiffs have not shown that any potential bigotry by Aramark managers was the basis for the discipline that led to Advocate's termination decision as to Johnson, Scott-Murray, and Smith. Nor have plaintiffs shown that Advocate did not genuinely believe the discipline had been issued for legitimate reasons. Without the necessary evidence to connect racial animus to Advocate's decision to terminate Johnson, Scott-Murray, and Smith, plaintiffs' wrongful termination claims fail.

## IV. Conclusion

Advocate's motion for summary judgment, [42], is granted. Enter judgment and terminate civil case.


ENTER:

Manish S. Shah
United States District Judge

Date:  10/7/2016